UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MATTHEW D. BJELOBRK and JAY VERONKO,

                    Plaintiffs,

          v.

SUFFOLK COUNTY, SUFFOLK COUNTY POLICE DEPARTMENT, and SUFFOLK COUNTY DEPARTMENT OF HUMAN RESOURCES, PERSONNEL AND CIVIL SERVICE,

                    Defendants.

**MEMORANDUM & ORDER**
23-CV-08811 (HG)

**HECTOR GONZALEZ**, United States District Judge:

      Plaintiffs Matthew Bjelobrk and Jay Veronko, two former servicemembers and police officers, sued Suffolk County, the Suffolk County Police Department ("SCPD"), and the Suffolk County Department of Human Resources, Personnel, and Civil Service ("Civil Service Department").  They allege that, during their employment with the SCPD, they were discriminated and retaliated against in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA").  Defendants have moved to dismiss Plaintiffs' claims.  For the reasons explained below, their motion is granted as to Veronko and is granted in part and denied in part as to Bjelobrk.

## BACKGROUND

      The Court "recite[s] the substance of the allegations as if they represent[] true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d

Cir. 2021).[1]  For the sake of readability, the Court does not recount the Veronko-specific allegations in detail and discusses them only as necessary for its legal analysis below since his claims fail on a threshold issue implicating just a few alleged facts.

Bjelobrk enlisted in the U.S. Army Reserve in 1988, received a commission in 1991, and entered the New York Army National Guard in 1991.  ECF No. 1 ("Compl.") ¶ 15.  In 1993, he graduated from Army flight school, where he flew helicopters, and served as a company commander of a helicopter company from 1995 to 2001.  *Id.*  During his time with the SCPD, he participated in various military deployments with the U.S. Army, including to Iraq, Afghanistan, and Kuwait.  *Id.* ¶ 16.

Bjelobrk joined the SCPD as a police officer in 1994.  *Id.* ¶ 17.  Bjelobrk's first assignment as a police officer was with the SCPD's Third Precinct, where he worked "steady midnights with full night differential."  *Id.* ¶ 18.  While at the Third Precinct, Lieutenant Donna Engel told Bjelobrk that his "active membership in [the] United States Army Reserve was difficult to manage on the schedule and the coverage for his service was too expensive."  *Id.* ¶ 19.  After that conversation, the precinct commander, Inspector Jack Hough, "transferred Bjelobrk to the two-tours (alternating 8-4PM/4-12AM day tours) with less night differential and significantly reduced opportunity for overtime."  *Id.* ¶ 20.  Bjelobrk complained about the transfer as a violation of "federal and state law," to which Engel replied, "Do what the fuck you want with it, you're fuckin' transferred."  *Id.* ¶ 21.  Several months later, Hough put Bjelobrk back on midnight tours, stating that "[y]ou are not going back to your fucking squad," and assigned Bjelobrk to another squad to "isolate and punish" him.  *Id.* ¶ 22 (capitalization omitted).

---

[1]    Unless otherwise indicated, when quoting cases and the parties' papers, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

In 1995, soon after Bjelobrk returned to his midnight tours, he applied for a position in the SCPD's Aviation Unit. *Id.* ¶ 23. The SCPD previously assigned "qualified police officers on probation, some right after graduating the Police Academy, to the Aviation Unit." *Id.* ¶ 24. However, Hough told Bjelobrk that he was unqualified for the Aviation Unit because he was on probation and because his military service would create too much of a hardship for that unit's schedule. *Id.* ¶ 25.

In 1999, Bjelobrk transferred to the SCPD Highway Patrol Bureau, and soon after that, to the Driving While Intoxicated Enforcement Team. *Id.* ¶ 26. He then became a certified drug recognition expert ("DRE"), as was required for membership on that team. *Id.* ¶ 27. He went on to be the "most productive member of the team with the highest number of arrests and the highest number of recorded DRE arrests." *Id.* Before a DRE instructor course, Sergeant Michael Cosgrove told Bjelobrk that his military service would interfere too much with the duties of a DRE instructor and excluded him from the course, even though all other certified DRE officers were sent to the course. *Id.* ¶¶ 28–29. Bjelobrk was the sole member of his team who was a "member of the Armed Forces Reserve/National Guard." *Id.* ¶ 29. Certified DRE instructors had increased opportunities for overtime, court appearances, and trainings. *Id.* ¶ 30.

In late 2002, Bjelobrk was still assigned to the Highway Patrol Bureau. *Id.* ¶ 31. The SCPD announced openings in "Motorcycle School," which only highway officers could attend. *Id.* Officers assigned to the Motorcycle Unit enjoyed "lucrative" overtime availability "because of the numerous [police] details that would surface with little notice" and because the SCPD tried to keep the size of the unit small to reduce costs. *Id.* ¶ 32. Bjelobrk applied to take a class at Motorcycle School, and Captain Robert Ponzo informed Bjelobrk that he was scheduled to attend the class. *Id.* ¶ 33. But two days before that class was to begin, Lieutenant John O'Brien

3

told Bjelobrk that his military service would "be too great of an interference" for a motorcycle officer and removed him from the class. *Id.* ¶ 34.

In 2004, Bjelobrk moved to the SCPD's Seventh Precinct. *Id.* ¶ 35. At that time, being assigned to the Community Oriented Police Enforcement ("COPE") unit was the "first step" to being assigned to the Precinct Crime Unit, which would put him on the path toward promotion to detective. *Id.* ¶ 36. It was competitive for officers to join the COPE unit and COPE assignments depended on an officer's attendance records and "summons/arrest activity." *Id.* ¶ 37. In 2005, as Bjelobrk returned from an eighteen-month military tour in Iraq, there was a vacancy in the Seventh Precinct's COPE unit. *Id.* ¶¶ 16, 38. Bjelobrk interviewed with Lieutenant Brown for the COPE role, and Brown interviewed two other candidates as well. *Id.* ¶ 38. Brown told Bjelobrk that he had not spent enough time in the Seventh Precinct and that his military service "would be a tremendous burden" on the COPE mission. *Id.* ¶ 39. Although Bjelobrk was more senior than the other two applicants and had more arrests and issued more summonses than the other applicants, he was not assigned to the COPE unit. *Id.* ¶ 40.

In 2007, Bjelobrk was promoted to sergeant through the civil service promotional system. *Id.* ¶ 41. Later, in 2010, Bjelobrk applied for an open K-9 sergeant position and interviewed with Lieutenant Brian Coltellino for the role. *Id.* ¶ 42. Coltellino first asked Bjelobrk about whether Bjelobrk was still in the Army Reserve; Bjelobrk responded that the "question was illegal and did not bare [sic] upon [his] qualifications." *Id.* ¶ 43. Coltellino replied, "Alright, alright," asked a few more questions about Bjelobrk's interest in the position, and ended the interview by asking about Bjelobrk's next military deployment. *Id.* ¶ 44. Coltellino did not select Bjelobrk for the position. *Id.* ¶ 45.

In 2013, Bjelobrk applied for a "Commanding Officer (Sergeant)" position in the "SCPD Firearms and Tactics Session."[2]  *Id.* ¶ 46.  That position was associated with "generous overtime opportunities."  *Id.* ¶ 47.  Bjelobrk was the "only applicant" who fulfilled all the requirements for the position.  *Id.* ¶ 48.  His qualifications included serving as a combat advisor in Afghanistan and Iraq, where he commanded a unit with a "primary mission" of training foreign police and military in firearms and tactics.  *Id.*  At the interview for that position, he "answered inappropriate questions about his military service schedule and likelihood of future mobilizations."  *Id.* ¶ 49.  He was not selected for the position.  *Id.*  Later in 2013, he applied for the Executive Officer role in Firearms and Tactics.  *Id.* ¶ 50.  That position was also associated with "generous overtime opportunities."  *Id.*  He "answered inappropriate questions about his . . . military service regarding drills, annual training, and future mobilizations" during his interview for the position.  *Id.*  His interviewer told him that the military service was too much of an interference for the position.  *Id.*[3]  In 2016, he again applied for the Commanding Officer position in Firearms and Tactics but "was not granted an interview because of his . . . military service."  *Id.* ¶ 51.  Instead, the SCPD selected a sergeant with less than nine years with the Department, two of which he spent as a sergeant, representing "significantly less time than Bjelobrk" had obtained.  *Id.*  The selected sergeant also had no police or military weapons training nor experience supervising weapons training.  *Id.*

During the times relevant to this action, civil service promotional opportunities were advertised "well in advance" of the relevant exam dates to allow applicants the chance to study for the exams.  *Id.* ¶ 55.  Both before and after 2003, the SCPD was able to individually notify

---

[2]      The Court assumes that this was intended to refer to "Section."

[3]      Bjelobrk does not explicitly allege that he was not selected for the position.

officers about civil service promotional exams, special assignment openings, and training opportunities. *Id.* ¶ 52. On four separate occasions after 2003, while Bjelobrk was deployed for military service, the SCPD failed to notify him about the opportunities just described, even though it was able to reach him by email, and actually did reach him by email, on several occasions during his deployments. *Id.* ¶¶ 53–54.

Bjelobrk served an active-duty military tour from January 28, 2012, to April 2, 2013. *Id.* ¶ 56. During that time, on October 10, 2012, the Civil Service Department offered a promotional exam for the rank of lieutenant. *Id.* ¶ 57. Before the exam, in 2012, the SCPD provided all sergeants who had signed up for the exam with a study guide. *Id.* ¶ 58. When Bjelobrk returned from his tour in April 2013, he immediately told the Civil Service Department that he wanted to take that October 2012 promotional exam and the Department scheduled it for September 13, 2013. *Id.* ¶ 59. He also immediately asked for "study materials" from the SCPD, but the SCPD did not provide them until September 2013. *Id.* ¶ 60. Then, he could not take the September 13, 2013, exam because of his regularly scheduled military drill. *Id.* ¶ 61. The Civil Service Department then rescheduled it for September 22, 2014. *Id.* Based on subsequent allegations, this appears to be an error and should refer to September 22, 2013. *See id.* ¶ 64 ("Bjelobrk took the promotional exam in 2013 . . . ."); *see also id.* ¶¶ 60, 63 (alleging that he received the study guide in September 2013 and had the guide for "one month" when he took the exam). Bjelobrk asked for another exam date further out in the future several times, so that he would have had the same amount of time to study as the other applicants had and because he had only had the study materials for one month, but the Civil Service Department did not consider his request. *Id.* ¶¶ 62–63. He took the exam with around seven months less of study time than the other applicants had and failed to obtain a "competitive grade." *Id.* ¶ 64.

6

Bjelobrk retired from the SCPD on July 31, 2016.  *Id.* ¶ 68.  According to him, "[t]he New York State pension system for Suffolk County Police Officers uses a formula that accounts for the average annual earnings for the highest pay earned in a consecutive thirty-six month period of employment in order to calculate a retiree's pension."  *Id.* ¶ 65.  The SCPD reported to New York State a "top consecutive thirty-six month earnings" that included a period of time in which he was performing active military duty, resulting in a "significantly lower earnings amount than should have been reported."  *Id.* ¶¶ 66–67, 69.  Between August 2016 and August 2017, Bjelobrk made inquiries with the "New York State Pension Fund" and the SCPD about "correct[ing] this USERRA violation before [his] pension finalized."  *Id.* ¶ 70.  He states, however, that "the State had no legal mechanisms to deviate from the information provided by a pensioner's employer."  *Id.*  When his pension was "finalized" in August 2017, he was to receive around $1,500 less per month than he claims to have been entitled to.  *Id.* ¶ 71.

During three of Bjelobrk's active-duty tours, the SCPD "forced" him to use his accrued sick leave after he had "exhausted" his other authorized and accrued military, compensatory, personal, and vacation leaves.  *Id.* ¶ 73.  The SCPD then charged him for two days of accrued sick leave for every one day actually used.  *Id.*

Bjelobrk states that during his time with the SCPD, he received derogatory comments about his military service from Brown, Coltellino, Engel, Hough, O'Brien, and Cosgrove, as well as Inspecting William Neubauer and "many other supervisors."  *Id.* ¶ 74.

Bjelobrk states that but for the SCPD's "discrimination and retaliation" concerning his military service and complaints about discrimination, he would not have retired when he did, and that his retirement in 2016 deprived him of additional income and a larger pension.  *Id.* ¶ 75.

Plaintiffs sued on November 30, 2023.  *See* Compl.  After the Court entered a case management plan on January 10, 2024, *see* ECF No. 8, the Court stayed this action on February 2, 2024, pending a decision in a parallel state court proceeding, *see* ECF No. 13.  Following the discontinuance of the parallel action, *see* ECF Nos. 15, 15-1, the Court directed the parties to propose a new case management plan, which the Court entered on April 9, 2024.  The parties are in discovery.

On January 24, 2024, Defendants filed a pre-motion conference letter in anticipation of a motion to dismiss.  *See* ECF No. 9.  Plaintiffs filed their opposition on January 29, 2024.  *See* ECF No. 10.  Defendants later filed a supplement to their pre-motion letter, *see* ECF No. 11, which Plaintiffs opposed, *see* ECF No. 12.  In its stay order, the Court denied the motion for a pre-motion conference as unnecessary.  *See* ECF No. 13 at 1.  Later, after the stay was lifted, Defendants filed a letter indicating their intention to file their proposed motion to dismiss, *see* ECF No. 16, which Plaintiffs opposed, *see* ECF No. 17.  Defendants filed their motion to dismiss on May 7, 2024.  *See* ECF No. 22.  Plaintiffs filed their Opposition, with no request for leave to amend, on May 15, 2024.  *See* ECF No. 23.  Defendants filed their Reply on June 4, 2024.  *See* ECF No. 25.

## LEGAL STANDARD

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"In making this assessment, the court must accept as true all of the factual allegations set out in plaintiffs['] complaint, draw inferences from those allegations in the light most favorable to plaintiff[s], and construe the complaint liberally." *VR Glob. Partners, L.P. v. Petróleos de Venezuela, S.A.*, No. 24-1176-cv, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

## DISCUSSION

The Court begins by addressing two threshold issues. First, it dismisses the SCPD and Civil Service Department as non-suable entities. Second, it concludes that Veronko fails to allege coverage under USERRA. The Court then proceeds to its analysis of Bjelobrk's USERRA discrimination and retaliation claims.

### I.    Suable Entities

Defendants SCPD and the Civil Service Department seek dismissal on the basis that they are not suable. *See* ECF No. 22-6 at 26. Plaintiffs fail to respond to this argument in Opposition and therefore have abandoned their claims against these entities. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims . . . that are not defended have been abandoned."); *accord St. Francis Holdings, LLC v. MMP Cap., Inc.*, No. 20-cv-4636, 2022 WL 991980, at *16 (E.D.N.Y. Mar. 31, 2022) (collecting cases). In any event, Defendants are right as a matter of law. Plaintiffs allege that both SCPD and the Civil Service Department are "subsidiar[ies]" of Suffolk County. *See* Compl. ¶¶ 12–13. However, "[u]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Rose v. Cnty. of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012). "Accordingly, where both the municipality and the municipal department have been named as defendants, courts routinely

have dismissed the claims against the department." *In re Dayton*, 786 F. Supp. 2d 809, 818 (S.D.N.Y. 2011); *see also Rivera v. Cnty. of Suffolk*, No. 19-cv-0610, 2022 WL 1810717, at *2 (E.D.N.Y. June 2, 2022) (dismissing claims against the SCPD because it is non-suable).  The Court therefore dismisses Plaintiffs' claims against the SCPD and Civil Service Department.

## II.    Veronko's Claims

Defendants seek dismissal of all of Plaintiff Veronko's claims on the basis that he fails to allege coverage under USERRA.  *See* ECF No. 22-6 at 13–16.  The Court first discusses the statute's coverage provisions and then applies them to Veronko's allegations.[4]

### A.    Coverage Under USERRA

USERRA protects persons who have "perform[ed] service in a uniformed service" from denial of "any benefit of employment by an employer on the basis of that" service.  38 U.S.C. § 4311(a).  What is "service in a uniformed service"?  Before January 5, 2021, it

> mean[t] the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority and include[d] active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty, a period for which a System member of the National Urban Search and Rescue Response System is absent from a position of employment due to an appointment into Federal service under section 327 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, and a period for which a person is absent from employment for the purpose of performing funeral honors duty as authorized by section 12503 of title 10 or section 115 of title 32.

---

[4]      Defendants claim that failure to plead USERRA coverage deprives this Court of "jurisdiction" over Veronko's claims.  *See* ECF No. 22-6 at 16.  For the avoidance of doubt, the Court makes clear that their argument is not actually a Rule 12(b)(1) challenge to this Court's subject-matter jurisdiction; rather, their claim is that there is an "absence of a valid . . . cause of action" for Veronko, which "does not implicate subject-matter jurisdiction, i.e., the [C]ourt's statutory or constitutional *power* to adjudicate the case."  *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (emphasis in original) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)); *accord Green v. Dep't of Educ.*, 16 F.4th 1070, 1075–76 (2d Cir. 2021).

38 U.S.C. § 4303(13) (2021), *amended by* Johnny Isakson and David P. Roe, M.D. Veterans

Health Care and Benefits Improvement Act of 2020, Pub. L. No. 116-315, § 7004, 134 Stat.

4932, 5058–59 (2021).  It further provided that "[t]he term 'uniformed services' means," as

relevant here, "the Armed Forces, the Army National Guard and the Air National Guard when

engaged in active duty for training, inactive duty training, or full-time National Guard duty."  *Id.*

§ 4303(16).[5]  Then, on January 5, 2021, Congress expanded coverage to include:

> The term "service in the uniformed services" means the performance of duty on a
> voluntary or involuntary basis in a uniformed service under competent authority
> and includes active duty, active duty for training, initial active duty for training,
> inactive duty training, full-time National Guard duty, *State active duty for a period
> of 14 days or more, State active duty in response to a national emergency* declared
> by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.), *State
> active duty in response to a major* disaster declared by the President under section
> 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42
> U.S.C. 5170) . . . .[6]

38 U.S.C. § 4303(13) (2021) (emphasis added) ("Amended USERRA").  It further provided:

> The term "State active duty" means training or other duty, other than inactive
> duty, performed by a member of the National Guard of a State--
>
> > (A) not under section 502 of title 32 or under title 10;
> > (B) in service to the Governor of a State; and
> > (C) for which the member is not entitled to pay from the Federal
> > Government.

38 U.S.C. § 4303(15) (2021).

### B.    *Coverage for Veronko*

Veronko served in the U.S. Army, U.S. Army Reserve, and U.S. Navy Reserve before

retiring in 2017.  Compl. ¶ 77.  He was then in the New York State Naval Militia from January

---

[5]    In all respects material to this case, these categories are the same in the current version of
the statute.

[6]    Subsequent amendment to the statute to cover "intermittent personnel" working for the
Federal Emergency Management Agency is immaterial to this decision.  *See* 38 U.S.C.
§ 4303(13) (2025).

2017 to January 2021. *Id.* ¶ 78. Veronko joined the SCPD in 1993 and he retired from there on January 10, 2021. *Id.* ¶¶ 82, 103. Importantly, his own Complaint states that he does not seek to hold Defendants liable for any conduct before June 6, 2018 (the relevant cutoff pursuant to a prior settlement with Suffolk County and the SCPD). *Id.* ¶¶ 83–84. In their motion, Defendants argue that Veronko fails to state a claim because the only qualifying service during the relevant June 7, 2018, to January 10, 2021, period, was in the state Naval Milita. ECF No. 22-6 at 15. They raise two specific points. First, they argue that service in the Naval Militia is not covered by USERRA. *Id.* Second, they argue that even if Veronko's service in the Naval Militia could qualify as a general matter, Veronko's period of service did not qualify as "State active duty" under a part of the Amended USERRA's temporal requirements. *Id.* Specifically, Defendants contend that Veronko has failed to allege the requisite "State active duty" between USERRA's amendment to cover such service (on January 5, 2021) and his retirement five days later (on January 10, 2021).

As a threshold issue, to state a claim under USERRA, Veronko must allege that his service "fall[s] within any of USERRA's expressly protected categories of military service." *Monaghan v. Cnty. of Glouchester*, 599 F. Supp. 3d 196, 206 (D.N.J. 2022). On this issue, the Court agrees that Veronko fails to allege such coverage and holds, as an apparent matter of first impression, that service in the New York Naval Militia is not covered by USERRA. For Defendants to have violated USERRA, service in the state Naval Militia must have constituted service "in a uniformed service under competent authority." 38 U.S.C. § 4303(13). That includes "State active duty for a period of 14 days or more," "State active duty in response to a national emergency," and "State active duty in response to a major disaster." *Id.* Notably, in Opposition, Veronko does not claim to belong to any of these "State active duty" categories

provided for by the Amended USERRA.  *See* ECF No. 23 at 9–10.  He has therefore abandoned any reliance on these categories.  *See Jackson*, 766 F.3d at 198.

In any event, even if Veronko tried to allege coverage under the "State active duty" provisions, such effort would have been unsuccessful.  That is because "'State active duty' means training or other duty, other than inactive duty, performed by a member of the National Guard of a State."  38 U.S.C. § 4303(15).[7]  But in New York, the Naval Militia does not belong to the National Guard.  *See* N.Y. Mil. Law § 2(1) ("The organized militia shall be composed of the New York army national guard; the New York air national guard; the inactive national guard; the New York naval militia; the New York guard whenever such a state force shall be duly organized and such additional forces as may be created by the governor."); *see also id.* § 43 (establishing the Naval Militia).[8]  In Opposition, Veronko pivots to an alternative.  Rather than relying on USERRA's "State active duty" provisions, he refers to USERRA's broader reference to "uniformed service under competent authority."  *See* ECF No. 23 at 9 (citing 38 U.S.C. § 4303(13)).  But as Defendants correctly observe in Reply, ECF No. 25-1 at 5, "uniformed services" covers specific positions, and critically, they are all federal.  *See* 38 U.S.C. § 4303(17) (including, for example, certain service in the Army National Guard and Air National Guard).[9]

---

[7]    *See also* § 7004, 134 Stat. at 5058 ("Extension of Certain Employment and Reemployment Rights to Members of the National Guard Who Perform State Active Duty" (capitalization altered)).

[8]    Veronko also cites 10 U.S.C. § 311 in error.  *See* ECF No. 23 at 10.  He intends to cite to that statute's successor, 10 U.S.C. § 246.  In any event, his citation to that statute further undermines his argument because the statute, in describing the United States militia, distinguishes between the National Guard and the Naval Militia.  10 U.S.C. § 246(b)(1).

[9]    This is consistent with USERRA's general distinction between service under federal and state authority.  *See Monaghan*, 599 F. Supp. 3d at 206–07 (citing USERRA's implementing regulation, 20 C.F.R. § 1002.57, and explaining "USERRA's clear distinction between National Guard service pursuant to the authority of federal versus state law").

Perhaps recognizing this statutory barrier, Veronko appeals to more general principles. For example, he says that Defendants' position undermines USERRA's stated purpose of "encourag[ing] ***noncareer service*** in the uniformed services."  *See* ECF No. 23 at 8 (Plaintiff's emphasis) (quoting 38 U.S.C. § 4301(a)(1) (2025)).  However, even if the relevant part of that language were still good law,[10] it could not displace Section 4303's detailed coverage definitions, as "a specific provision controls over one of more general application," *Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019), and the Court cannot rely on an "[a]pplication of 'broad purposes' of legislation at the expense of specific provisions," *Bd. of Governors. v. Dimension Fin. Corp.*, 474 U.S. 361, 373–74 (1986).  He then casts aspersions on his adversaries, accusing them of showing "disdain for military service," and urging the Court not to "subscribe to such an insulting premise."  *See* ECF No. 23 at 10.  Obviously, that does not inform the statutory inquiry.  And ultimately, reasonable minds may disagree about whether USERRA's scope should be expanded to apply to service like that alleged here.  However, that is a problem for Congress, and not this Court, to address.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").  Accordingly, Veronko's causes of action under USERRA necessarily fail, and Counts III and IV, which both arise under the statute, are dismissed.[11]

---

[10]     Congress recently removed the "noncareer" portion of the statute.  *See* Senator Elizabeth Dole 21st Century Veterans Healthcare and Benefits Improvement Act, Pub. L. No. 118-210, § 221, 138 Stat. 2706, 2778 (2025).

[11]     Because the Court agrees with Defendants that Veronko fails to allege military service protected by USERRA as a general matter, it need not reach their more specific argument regarding USERRA's temporal requirements, especially in light of Veronko's abandonment of the "State active duty" categories of service, 38 U.S.C. § 4303(13), one of which has such a requirement.

### III.    Bjelobrk's Claims

In Counts I and II, Bjelobrk alleges that Defendants engaged in illegal discrimination and

retaliation under USERRA.  The Court addresses Defendants' argument regarding the statute of

limitations before proceeding to the merits.

### A.    Timeliness

Defendants contend that USERRA claims based on "wrongful acts occurring prior to

October 10, 2004" are time-barred.  *See* ECF No. 22-6 at 23.  From the time of USERRA's

enactment in 1994 through November 1998, there was no reference to a statute of limitations,

and a November 1998 amendment provided that *state* statutes of limitations were inapplicable to

USERRA claims.  *See Tully v. Cnty. of Nassau*, No. 11-cv-2633, 2012 WL 487007, at *5

(E.D.N.Y. Feb. 14, 2012).  Between the time of USERRA's enactment and the Veterans'

Benefits Improvement Act ("VBIA"), which came into effect on October 10, 2008, there was no

reference to a *federal* statute of limitations.  *Id.*  The VBIA then expressly eliminated reference

to any statute of limitations, *id.*, as in the current version of the statute, 38 U.S.C. § 4327(b).  As

such, prior to the VBIA, "many courts applied the four-year 'catch-all' statute of limitations set

forth in 28 U.S.C. § 1658 to USERRA claims."  *Tully*, 2012 WL 487007, at *5.

Today, courts continue to use Section 1658's generic four-year limitations period for pre-

VBIA USERRA claims.  *See id.* at *6–7 (collecting cases).  However, it is important to note that

that limitations period does not apply to claims that were "live" at the time of the VBIA's

enactment.  *See Goodman v. City of New York*, No. 10-cv-5236, 2011 WL 4469513, at *7

(S.D.N.Y. Sept. 26, 2011).  In other words, claims "that were still within the four-year

limitations period" at the time of the VBIA's enactment enjoy its elimination of any time bar.

*See Tully*, 2012 WL 487007, at *8.  Thus, Defendants are right in identifying the outer limit of

Bjelobrk's potential USERRA claims at October 10, 2004. *See Lapaix v. City of New York*, No. 13-cv-07306, 2014 WL 3950905, at \*5 (S.D.N.Y. Aug. 12, 2004) (doing the same in a similar posture); *accord Brill v. AK Steel Corp.*, No. 09-cv-534, 2012 WL 893902, at \*8–11 (S.D. Ohio Mar. 14, 2012). In Opposition, Bjelobrk asserts that the current version of the statute with no time bar applies to all of his claims dating back to 1994. *See* ECF No. 23 at 14. That argument, however, ignores the effect of Section 1658 in the period before the VBIA explicitly eliminated its applicability. *See Tully*, 2012 WL 487007, at \*7 (rejecting the same argument).

Accordingly, the Court agrees with Defendants that "the four-year statute of limitations provided for in § 1658 applies to USERRA claims that accrued and expired before October 10, 2008." *Cabrera v. Perceptive Software, LLC*, 147 F. Supp. 3d 1247, 1250 (D. Kan. 2015). As applied to this case, that requires the dismissal of any claims accruing before Bjelobrk's assignment to the Seventh Precinct in 2004. *See* Compl. ¶ 35. Because any USERRA claim related to his work in the Seventh Precinct arose following his return from service in Iraq in 2005, *see id.* ¶ 38, his claims from that point forward are timely, and the Court's below analysis is limited to those claims.

### B.    Pleading Adequacy

The Court now proceeds to the substantive analysis of Bjelobrk's timely allegations in the same order as they appear in the Complaint. As a reminder, Counts I and II allege that Defendants' conduct constituted both illegal discrimination and retaliation under USERRA. *See* Compl. ¶¶ 114–17.

16

i.    <u>Legal Framework</u>[12]

"The purpose of USERRA is to encourage military service by eliminating or minimizing the disadvantages to civilian careers." *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 174 (2d Cir. 2011).  Most relevant here, USERRA protects members of the uniformed services, including those who are in the military reserves, *see Mock v. City of Rome*, 910 F. Supp. 2d 429, 430–31 (N.D.N.Y. 2012), from discrimination on the basis of their military service by providing that

> [a] person who is a member of, . . . has performed, . . . or has an obligation to perform service in a uniformed service shall not be denied . . . retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation.

38 U.S.C. § 4311(a).  The statute defines "a benefit of employment" as "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." *Id.* § 4303(2).

Courts in the Second Circuit apply a two-step burden shifting analysis to discrimination claims under USERRA.  *See Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 529–30 (S.D.N.Y. 2017) (collecting cases).  At step one, the employee must show by a preponderance of evidence that his protected status was "a substantial or motivating factor in the adverse employment action." *Gummo v. Vill. of Depew*, 75 F.3d 98, 106 (2d Cir. 1996).  "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Lapaix*, 2014 WL 3950905, at *5.  This may be proved through "direct or circumstantial evidence, including an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and

---

[12]    This subsection is adapted from Judge Furman's recent decision in *Hansen v. City of New York*, No. 24-cv-2808, 2025 WL 588119, at *3–8 (S.D.N.Y. Feb. 24, 2025).

disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id.* A motivating factor "is not necessarily the sole cause of the action, but rather it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Fink v. City of New York*, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001). Moreover, "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis in original).

"Once the employee proves that his military status served as a motivating factor in the employer's adverse decision, the employer may nonetheless escape liability" at step two "by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." *Woodard v. N.Y. Health & Hosps. Corp.*, 554 F. Supp. 2d 329, 349 (E.D.N.Y. 2008), *remanded in irrelevant part*, 350 F. App'x 586 (2d Cir. 2009). Ultimately, to state a plausible USERRA discrimination claim and survive a motion to dismiss, a plaintiff must plead "facts upon which it could plausibly be inferred that his military service or any protected activity was a substantial or motivating factor in the adverse employment actions." *Hunt v. Klein*, 476 F. App'x 889, 891 (2d Cir. 2012).

In addition to prohibiting acts of discrimination, USERRA bars an employer from "tak[ing] any adverse employment action or other retaliatory action against any person because such person . . . has taken an action to enforce a protection afforded any person under this chapter." 38 U.S.C. § 4311(b). To make out a *prima facie* case of retaliation under USERRA, "a plaintiff must show that (1) he was engaged in protected activity; (2) that the employer was aware of that activity; (3) that the plaintiff suffered an adverse employment action; and (4) that

there was a causal connection between the protected activity and the adverse action." *Kassel*, 272 F. Supp. 3d at 537.  More specifically, a servicemember claiming retaliation under Section 4311(b) must show that he suffered a "materially adverse" employment action "such as termination, demotion accompanied by a loss of pay, or a material loss of benefits or responsibilities that significantly alters the terms [or] conditions of his employment." *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 892 (7th Cir. 2011); *see Croft v. Vill. of Newark*, 35 F. Supp. 3d 359, 370 (W.D.N.Y. 2014).  He also "must demonstrate that [his] exercise of [his] USERRA rights was a motivating factor in [the defendant's] action, unless [the defendant] can prove that the action would have been taken in the absence of [the plaintiff's] USERRA complaints." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006); *see also Lisdahl v. Mayo Found.*, 633 F.3d 712, 720 (8th Cir. 2011) (same); *Croft*, 35 F. Supp. 3d at 377–78 (same). The Court now applies these standards to Bjelobrk's timely allegations.

ii.    <u>Transfers</u>

Bjelobrk complains that he was not selected for assignment to the COPE unit.  Compl. ¶ 40.  He alleges that when Lieutenant Brown interviewed him for the position, Brown told him that he had not spent enough time at the Seventh Precinct and that his military service would be a "tremendous burden upon the mission of the COPE unit." *Id.* ¶ 39.  Bjelobrk also claims that although selection for the position depended on attendance and summons and arrest activity, he was passed over despite being the most senior officer in the group and having more arrests and summonses than the other two candidates combined. *Id.* ¶¶ 37, 40.  Defendants raise a generic argument that Bjelobrk "fails to allege any non-conclusory facts in support of these assertions." *See* ECF No. 22-6 at 23–24.  But just asserting as much does not make it so.  Here, Bjelobrk's specific allegations plausibly allege that his military service was a "motivating factor for the

decision" not to place him in the COPE unit.  *See Kassel*, 272 F. Supp. 3d at 533–34 (collecting

cases); *see also Croft*, 35 F. Supp. 3d at 372–73 (denying summary judgment to employer which

did not promote serviceman after supervisor told him that he "wasn't around enough").

　　　　Bjelobrk next alleges that when he applied for a "K-9 Sergeant position," Lieutenant

Coltellino began the interview by asking about whether he was "still in the Army Reserves," to

which "Bjelobrk responded by stating [that] the question was illegal and did not bare [sic] upon

Bjelobrk's qualifications."  Compl. ¶¶ 42–43.[13]  Coltellino replied, "Alright, alright," asked

questions about Bjelobrk's interest in the position, and ended the interview by asking about

Bjelobrk's next military deployment.  *Id.* ¶ 44.  Defendants raise the same single boilerplate basis

for dismissal described above.  *See* ECF No. 22-6 at 23–24.  Although these allegations present a

closer call than those raised with respect to Brown, drawing all inferences in Bjelobrk's favor, he

has alleged just enough to "nudge h[is] claim across the line from conceivable to plausible."  *See*

*Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 323 (2d Cir. 2021).  Specifically, the allegations

that Coltellino began and ended the interview by asking about Bjelobrk's deployment obligations

plausibly suggest that his subsequent decision to not select Bjelobrk was motivated—"at least in

part"—by Bjelobrk's military obligations.  *See Kassel*, 272 F. Supp. 3d at 532–33 (denying

summary judgment to employer where, among other things, "[p]laintiff's military obligations

appeared to be one of the central points of discussion" in a promotional interview).

　　　　Bjelobrk also alleges that he applied but was not selected for the Commanding Officer

position in Firearms and Tactics.  Compl. ¶¶ 46, 49.  Defendants do some, but not much,

---

[13]　　For the avoidance of doubt, without any further factual elaboration, Bjelobrk's alleged
assertion was in error.  Just as "USERRA does not prohibit employers from requiring certain
notification procedures or documentation of military leave," *O'Connell v. Town of Bedford*,
No. 21-cv-170, 2022 WL 4134466, at *9 (S.D.N.Y. Sept. 12, 2022), it necessarily does not
categorically bar an employer from merely asking about a servicemember's military duty.
USERRA is an antidiscrimination and not a privacy statute.

additional analysis on the allegations here, specifically asserting that Bjelobrk's claim that he

was asked "'inappropriate questions'" about his military service is "vague." ECF No. 22-6 at 24

(quoting Compl. ¶ 49). The Court agrees that, had Bjelobrk only alleged that he was asked

"inappropriate questions about his military service schedule," that might not pass scrutiny on a

motion to dismiss. Compl. ¶ 49. But, as above, he has alleged more than that here, claiming that

the interviewer also asked about his "future mobilizations." *Id.* Plus, he alleges with specificity

his qualifications for the role, including that he was "the only applicant who fulfilled all the

[pre]requisites for the position." *Id.* ¶ 48. At this juncture, it is not the Court's role to assess

whether Bjelobrk "has any evidence to back up" his weighty assertions on this point. *Twombly*,

550 U.S. at 585. As such, when the Court considers his allegations together and draws all

inferences in his favor, it cannot conclude as a matter of law that Bjelobrk's military service did

not play a motivating role in his non-selection for the Commanding Officer position. *See Kassel*,

272 F. Supp. 3d at 533 (denying summary judgment to employer where, among other things,

servicemember showed that candidates with lower exam scores were promoted over him). For

essentially the same reasons, the Court denies Defendants' motion to dismiss based on

Bjelobrk's allegations concerning his 2013 application to become Executive Officer of Firearms

and Tactics. *See* Compl. ¶ 50. As it relates to that conduct, his allegations are clearer than with

respect to the application for the Commanding Officer position, as he specifically alleges, among

other things, that the interviewer specifically told him that his military service was "too big of an

interference" for him to be able to take the Executive Officer role. *Id.*

It is a closer call with respect to Bjelobrk's allegations concerning his second application

to become Commanding Officer of Firearms and Tactics in 2016. *See id.* ¶ 51. Unlike with the

other positions just discussed, he alleges that he was not even "granted an interview because of

his . . . military service." *Id.* Standing alone, that entirely conclusory allegation would be insufficient to state a claim for discrimination. He also alleges that a less experienced and less well-trained sergeant was selected over him for the role, *see id.*, but fails to allege that that sergeant was not in the same protected servicemember category as him. *Cf. Gentile v. Touro L. Ctr.*, No. 21-cv-1345, 2024 WL 1199512, at \*8–9 (E.D.N.Y. Mar. 20, 2024) (allegation that servicemember was passed over for another servicemember "insufficient to raise an inference of discrimination" under USERRA). Nevertheless, the Court is obliged to "assess[] the allegations of the complaint as a whole." *Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). And when the Court considers these allegations alongside his allegations related to his two prior attempts to apply to leadership positions in Firearms and Tactics, as just discussed, the Court finds that Bjelobrk has alleged enough (again, if not by much) that his military service played at least a motivating role in being denied an interview, and thus the opportunity to obtain, the Commanding Officer position the second time around. In summary, Bjelobrk has stated a claim for USERRA discrimination based on the non-transfers from the COPE unit onward, and Defendants' motion to dismiss these claims are denied.

When it comes to Bjelobrk's retaliation claims, both the Complaint and Defendants' motion leave much to be desired. On the one hand, Bjelobrk does not clearly allege what conduct constituted actionable retaliation (presumably, he intended it to be any conduct that he also alleges violated USERRA's antidiscrimination provisions, *see* Compl. ¶¶ 116–17 (incorporating all allegations, including those related to Veronko, as a basis for Bjelobrk's retaliation claim)). On the other hand, Defendants never explain why Bjelobrk fails to state a retaliation claim specifically. Indeed, as it relates to Bjelobrk, Defendants mention "retaliation"

only once in a header.  *See* ECF No. 22-6 at 23.  The Opposition does not even broach the issue.

*See generally* ECF No. 23.  And the Reply's treatment of retaliation is as thin as the motion's.

*See* ECF No. 25-1 at 10–12.  Against that nearly blank backdrop, where the parties "do not

address the merits," the Court declines to dismiss the USERRA retaliation claim in Count II.  *See*

*Patrizzi v. Bourne In Time, Inc.*, No. 11-cv-2386, 2012 WL 4833344, at *8 (S.D.N.Y. Oct. 11,

2012) (doing the same).  Effectively, Defendants, as movants, would have the Court *sua sponte*

scrub the Complaint to assess all the conduct described above to determine whether Bjelobrk

states a retaliation claim.  However, it is inappropriate for the Court to exercise its discretion to

do so without the benefit of "adversarial presentation" on this issue, especially as, in light of the

above analysis, this is not the kind of "frivolous" case in which district courts almost exclusively

exercise such authority.  *See Choi v. 37 Parsons Realty LLC*, 642 F. Supp. 3d 329, 334–35

(E.D.N.Y. 2022); *see generally Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 105 (2d Cir.

2022) (reaffirming the principle of party presentation).  Of course, Suffolk County may seek the

dismissal of the retaliation claims at summary judgment, but dismissal of the retaliation claim

based on this conduct is premature at this juncture.[14]

### iii.    Lieutenant's Promotional Exam

The next at-issue allegations concern the lieutenant's promotional exam.[15]  Bjelobrk

alleges that after he returned from military service in April 2013, he asked to take the exam that

---

[14]    For the avoidance of doubt, the Court observes that the parties do not even generally frame any of the additional conduct discussed from here on in terms of USERRA retaliation, and the Court does not understand any of that additional conduct beyond the non-transfers just discussed to sound in retaliation.

[15]    Because the Court is proceeding chronologically, it also pauses to note that Defendants do not move to dismiss Bjelobrk's claims based on the alleged failure to notify him about various opportunities with the SCPD while he was deployed.  *See* Compl. ¶ 53.  These allegations do not even feature in their statement of facts.  *See* ECF No. 22-6 at 8–10.  As such, the Court does not dismiss them at this stage, but observes that some of these incidents may be time-barred.  *See*

had been administered in October 2012. *See* Compl. ¶¶ 59. However, he claims that the SCPD did not provide him with the study guide until September 2013, shortly before he took the exam. *See id.* ¶¶ 60–61. As a result, he suggests, his peers were able to study for seven months more than he was. *See id.* ¶ 64. And he then performed poorly on the exam. *See id.* Defendants argue that these allegations fail to state a claim under USERRA. *See* ECF No. 22-6 at 24–25. Again, despite Bjelobrk's weak opposition, *see* ECF No. 23 at 13, the Court must disagree.

The Court's analysis is guided by the leading decision on this issue, *Sandoval v. City of Chicago*, 560 F.3d 703 (7th Cir. 2009). In that case, two police officers wanted to take a promotional exam but were on military duty abroad at the time it was administered. *Id.* at 704. They then asked their employer, the City of Chicago, to take the exam outside the United States, and Chicago allowed them to do so at the exam administrator's foreign offices. *Id.* Plaintiffs took the exams but later sued, contending "that they would have done better, and been promoted earlier, had the tests been offered closer to the places where they were stationed," and specifically, on their respective bases. *Id.* Writing for the Seventh Circuit, Judge Easterbrook rejected their USERRA discrimination claim. *Id.* His analysis began from the basic premise that "§ 4311 is an anti-discrimination rule." *Id.* He then observed that plaintiffs "were not turned away because they were on active duty; to the contrary, Chicago arranged for each to take the test outside the United States." *Id.* In other words, Chicago "treat[ed] persons on military service the same as other employees," analogizing that Chicago would have treated them the same way had they been on vacation or attending college abroad. *Id.* At bottom, plaintiffs' claims failed because they "want[ed] . . . not the same treatment as everyone else (an anti-discrimination norm), but *better* treatment than those who [we]re . . . outside Chicago when a test

---

Compl. ¶ 53 (referring to deployments "after 2003"). With the benefit of discovery, Suffolk County may be able to narrow or eliminate these claims later.

[was] offered." *Id.* at 704–05 (emphasis in original). However, "§ 4311 does not require accommodation, which is fundamentally different from an equal-treatment norm." *Id.* at 705.

On the surface, *Sandoval* looks quite similar to this case. Just as plaintiffs there argued that "they would have done better, and been promoted earlier, had the tests been offered closer to the places where they were stationed," *id.* at 704, Bjelobrk says (by implication) that he would have done better had he had more time with the study guide, *see* Compl. ¶¶ 63–64. And just as Chicago offered the test to the *Sandoval* plaintiffs, 560 F.3d at 704, so, too, did Suffolk County, *see* Compl. ¶¶ 59, 61. However, the analogy ends there, and the problem for Suffolk County, as alleged, is that the SCPD did not just offer the promotional test, but also offered a study guide to candidates. *Id.* ¶¶ 58, 60. Insofar as he alleges that the other candidates had seven more months to study than he did, his instant claim, contrary to Defendants' suggestion, is not just a cloaked accommodation claim. *See* ECF No. 22-6 at 25. Put differently, he asks not for "*better* treatment" than those not around for the test, but rather to have been able to take the test "on the same terms"—*i.e.*, with the study guide in advance—"available to persons not in military service." *Sandoval*, 560 F.3d at 704–05 (emphasis in original).

The Court easily disposes of Defendants' other arguments on this point. True, Bjelobrk appears to have mistakenly alleged that he actually took the test in September 2014 rather than in September 2013, but as previously noted, *see supra* at 6, that appears to be a typo in view of the surrounding allegations. *See Harris v. Loc. 3, Int'l Bhd. of Elec. Workers*, No. 22-cv-6612, 2024 WL 1367964, at *2 n.1 (E.D.N.Y. Mar. 31, 2024) (construing date mentioned in complaint as a typo). Defendants also take issue with the fact that Bjelobrk did not "allege when other applicants first gained access to [the study guide], and more importantly, cannot allege 'how much' other 'study time' 'all of the other applicants' had prior to the October 2012 exam,"

reasoning that they "may have had individual personal circumstances" that reduced their study time.  *See* ECF No. 22-6 at 24–25.  However, to the extent Defendants merely demand more detail, that is not required at this stage.  *See Twombly*, 550 U.S. at 555.  Construing the allegations in Bjelobrk's favor, and as previously explained, it suffices for now for him to have alleged that he received less time with the SCPD-provided study guide than non-servicemembers because the SCPD failed to timely provide him with that guide.  That also defeats the second prong of Defendants' argument:  Bjelobrk does not just complain that he had less time to study and should have been accommodated, but rather that he was not permitted to take the test "on the same terms available to" non-servicemembers.  *Sandoval*, 560 F.3d at 705.  The motion to dismiss the USERRA discrimination claim based on the promotional exam is denied.

<h4 style="text-align:center">iv.   <u>Vacation Policy</u></h4>

Bjelobrk's next allegation is the simplest:  "During three of Bjelobrk's active duty tours, SCPD forced him[] to use his accrued sick leave after [he] exhausted all of his other authorized and accrued leaves (military, compensatory, personal, and vacation time) and Defendant wrongfully charged [him] for two . . . days of accrued sick leave for every one . . . day of accrued sick leave actually used/paid."  Defendants contend that those allegations fail to state a claim because "they do not attempt to allege how Bjelobrk was 'forced' to use sick leave or 'wrongfully charged' the same, and more importantly, do not even attempt to allege that any such events had anything to do with Bjelobrk's military status."  ECF No. 22-6 at 25.  To be sure, the Complaint is not a model of clarity in its articulation of how exactly the alleged conduct violated USERRA.[16]  Most notably, neither the Complaint nor the Opposition even cites the

---

[16]   Bjelobrk adds much more detail to this allegation in his Opposition, which the Court disregards to the extent he is attempting to use the Opposition to supplement the Complaint with new facts.  *See Hansen*, 2025 WL 588119, at *7 ("It is axiomatic that 'a party is not entitled to

26

critical provision, 38 U.S.C. § 4316(b), which provides that "a person who is absent from a position of employment by reason of service in the uniformed services shall be deemed to be on furlough or leave of absence while performing such service and," as relevant here, "entitled to such other rights and benefits . . . as are generally provided by the employer of the person to employees having similar seniority, status, and pay," *id.* §§ 4316(b)(1)(A)–(B).

Here, the basic problem is that Bjelobrk fails to allege how Suffolk County's requirement that he use "accrued sick leave" denied him a "benefit of employment" under Section 4303(2). In Opposition, he explains that he would have preferred to use leave without pay during his deployments because cashing out on accrued sick leave upon retirement is more lucrative. *See* ECF No. 23 at 12. None of that, however, is pled in the Complaint.[17] And even if the Court were to credit it, it would not be enough to state a claim because it is essentially a demand for an accommodation, not protection from discrimination. *See Sandoval*, 560 F.3d at 704–05. In other words, absent an allegation that servicemembers like Bjelobrk were uniquely "forced" to use "accrued sick leave" after "exhaust[ing] all . . . other authorized and accrued leaves," he does not plausibly allege that he was denied equal treatment on account of his military status. *See id.* at 705; *see also Scanlan v. Am. Airlines Grp., Inc.*, 384 F. Supp. 3d 520, 527 (E.D. Pa. 2019) ("If a right and benefit is not provided to an employee on a non-military related absence, the right or benefit is not due the employee on military leave."). Similarly, the Court must dismiss the strand of Bjelobrk's claim that Defendants violated USERRA when he was "wrongfully charged"

---

amend its complaint through statements made in motion papers.'" (quoting *Wright v. Ernst & Young LLP*, 153 F.3d 169, 178 (2d Cir. 1998)).

[17] The Court admonishes Bjelobrk's counsel to abandon the dramatic and unprofessional attacks on his adversaries in future papers submitted to the Court. *See, e.g.*, ECF No. 23 at 12 (arguing that Suffolk County's leave policy "manifest[s] . . . Defendants' hatred of servicemembers").

additional accrued sick leave because he never alleges that the claimed miscalculation had anything to do with his military status; thus, as a matter of law, he fails to plausibly allege discrimination.  *See Hansen*, 2025 WL 588119, at *5 ("[E]ven assuming that some of these allegations concern a 'benefit of employment,' [plaintiff] pleads no non-conclusory allegations of discriminatory motive.").

v.    <u>Pension</u>

Defendants move for dismissal of Bjelobrk's USERRA pension claims.  *See* ECF No. 22-6 at 18–22.  As a reminder, Bjelobrk alleges that "[t]he New York State pension system" calculates pensions for SCPD police officers based on "a formula that accounts for the average annual earnings for the highest pay earned in a consecutive thirty-six month period of employment."  Compl. ¶ 65.  He connects this to USERRA by alleging that

> USERRA requires an employer with a pension that is based upon actual, but fluctuating earnings (fluctuations based upon variables like overtime, night differential, holiday premium pay, tour-change pay, etc.) to calculate the "average" extra earning of an employee over the course of a year and add those daily amounts to days the employee missed a day of work because of military duty in order to avoid discrimination.  38 USC § 4318(b)(3)(B).

Compl. ¶ 66.[18]  He further alleges that the "SCPD had the responsibility of calculating and reporting additional earnings to Comptroller [sic] for the purposes of calculating Bjelobrk's pension in accordance with 38 [U.S.C.] § 4318(b)(3)(B)."  *Id.* ¶ 67.  But, he says, the SCPD, "reported a top consecutive thirty-six month earnings to New York State that included a period of time in which [he] was performing active military duty," which "resulted in a significantly

---

[18]    The Court does not accept as true Plaintiff's interpretation of the obligations prescribed by USERRA.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  Rather, the Court recites them here to describe "the framework of [the] complaint" on this issue.  *See id.* at 679.

lower earnings amount than should have been reported." *Id.* ¶ 69.  He claims that this resulted in his pension earnings being smaller than they should have been. *Id.* ¶ 71.

"Among the protections provided by USERRA are provisions related to the pension benefits a servicemember receives from his civilian employer." *Goodman*, 2011 WL 4469513, at *1.  Specifically, the statute provides that "[e]ach period served by a person in the uniformed services shall, upon reemployment under this chapter, be deemed to constitute service with the employer . . . maintaining the plan for the purpose of determining the nonforfeitability of the person's accrued benefits and for the purpose of determining the accrual of benefits under the plan." 38 U.S.C. § 4318(a)(2)(B).  It further provides that

> [a]n employer reemploying a person under this chapter shall, with respect to a period of service described in subsection (a)(2)(B) [quoted above], be liable to an employee pension benefit plan for funding any obligation of the plan to provide the benefits described in subsection (a)(2) and shall allocate the amount of any employer contribution for the person in the same manner and to the same extent the allocation occurs for other employees during the period of service.

*Id.* § 4318(b)(1).  An "employer" is an "entity that pays salary or wages for work performed or that has control over employment opportunities," including a state, *id.* § 4303(4)(A)(iii), and its political subdivisions, *id.* § 4303(14).  And "[t]he employee's compensation during the period of service described in subsection (a)(2)(B) shall be computed:  (A) at the rate the employee would have received but for the period of service described in subsection (a)(2)(B), or (B) in the case that the determination of such rate is not reasonably certain, on the basis of the employee's average rate of compensation during the 12-month period immediately preceding such period (or, if shorter, the period of employment immediately preceding such period)." *Id.* § 4318(b)(3).

Defendants' central argument for dismissal is essentially that they are the wrong parties for Bjelobrk to assert this claim against.  They write that they do not "maintain[]" the pension plan within the meaning of 38 U.S.C. § 4318(a)(2)(B), but rather that New York State does. *See*

29

ECF No. 22-6 at 22.  Further, they argue that USERRA "does not impose an obligation on

[them] to 'report' or 'calculate' 'additional earnings[,]' or to pay employees based on that

pension benefit—that is an obligation *and 'liabil[ity]'* of the pension *plan*," or the "New York

State and Local Police and Fire Retirement System" ("NYSPFRS"), under 38 U.S.C.

§ 4303(4)(C).  *See id.* at 7, 22 (emphasis in original).  In Opposition, Bjelobrk raises a confusing

hodgepodge of arguments and cases, but at bottom, he asserts that this case is like *Goodman*.

*See* ECF No. 23 at 15.  In *Goodman*, plaintiffs alleged that they "regularly worked overtime and

night shifts, for which they received extra pay."  *Goodman*, 2011 WL 4469513, at *2.  During

their employment with the NYPD and while on military duty, they continued to receive their

base salaries, and contributions were made to their pension funds based on that rate of pay.  *Id.*

After retirement, they "allege[d] that they were deployed to active duty during the final thirty-six

months of their employment with the NYPD and, accordingly, their pension payments d[id] not

reflect the extra pay they would have received had they not been deployed."  *Id.*  Then-District

Judge Sullivan rejected defendants' contention that USERRA's pension provisions were only

intended to cover a situation where the servicemember "was not paid at all during his or her

period of military service" and went on to conclude that plaintiffs stated a claim on their theory

that their overtime and differential pay should have been included "in the calculation of their

pensionable compensation."  *Id.* at *3–6.[19]

---

[19]    In Opposition, Bjelobrk directs the Court to material produced in discovery which he claims was meant "to help [Defendants] understand the allegations and supporting attendance charts to substantiate [his] claims."  *See* ECF No. 23 at 15–16.  Because the instant motion is brought under Rule 12(b)(6), the Court disregards those materials and the other exhibits attached to his Opposition, which go beyond the pleadings.  *See Lugo v. City of Troy*, 114 F.4th 80, 88 (2d Cir. 2024) (interpreting Fed. R. Civ. P. 12(d)).  The Court similarly disregards the materials from outside the pleadings presented by Defendants.

Focusing on Defendant Suffolk County, its argument about coverage is novel but unpersuasive. To be sure, USERRA does not impose a specific obligation on Suffolk County to "report" or "calculate" "additional earnings," but that argument, which just reframes Bjelobrk's pension claim at a different level of generality, rather than attacks it on its merits, fails. Section 4318(b)(1) plainly required the County, as an "employer," to "allocate the amount of any employer contribution for [Bjelobrk] in the same manner and to the same extent the allocation occurs for other employees during the period of [his] service." So, the County's next move is to argue that it is not an employer for this purpose and that Bjelobrk needed to sue New York State or NYSPFRS instead. The problem is, though, that that argument does not prove enough. The County cannot seriously contest that it was Bjelobrk's "employer" within the meaning of the statute. 38 U.S.C. §§ 4303(4)(A)(iii), (14). Indeed, the one case it points to on this issue, *United States v. Guam*, No. 21-cv-00022, 2023 WL 3727475 (D. Guam May 30, 2023), directly undermines its argument. That is because the court there concluded that the Territory of Guam was "undisputably" an employer under Section 4303(4)(A) since it paid the servicemembers' salaries or wages, like Suffolk County here. *See id.* at *4–5.

Furthermore, it is irrelevant that USERRA might *also* deem NYSPFRS (or New York State) an "employer" for the purpose of assessing liability by reference to Section 4303(4)(C). As such, the County's attempt to distinguish *Goodman* on the basis that plaintiffs in that case sued both their former actual employer and their pension fund, *see* ECF No. 22-6 at 22, is not convincing. The potential availability of a cause of action against the pension plan *in addition to* the actual employer also demonstrates why the County cannot avoid liability merely because it claims not to "maintain[]" the pension plan under Section 4318(a)(2)(B). All that provision does is make another entity potentially liable. *See Guam*, 2023 WL 3727475, at *6 ("§ 4318 plainly

31

contemplates obligations on employers maintaining the plan—not just an actual employer."). Again, the County's own authority underlines this point, as the court in *Guam* also went on to conclude that the defendant pension fund was an employer by operation of Section 4303(4)(C). *Id.* at *5–7.

Finally, the Court notes that this interpretation is further "supported by the structure and context of the statute." *See United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016). First, as just mentioned, USERRA's pension provisions contemplate liability for multiple employers, *see* 38 U.S.C. §§ 4318(a)(2)(B), (b)(1), and its definitions even distinguish between an "actual employer of employees" and a pension plan, but nevertheless deem both to be employers, *id.* §§ 4303(4)(A), (C). Second, to the extent the County suggests that Section 4318(b)(1)'s reference to "determining the amount of such liability and any obligation of the plan" means that Bjelobrk was required to sue the plan to recover that liability, that is incorrect. Section 4323(g) explicitly states that in a USERRA action, "only an employer or a potential employer, as the case may be, shall be a necessary party respondent." Because Defendants raise no other arguments supporting dismissal of the pension claims, the Court sees no material distinction between the allegations here and those in *Goodman*. Accordingly, Defendants' motion to dismiss the Bjelobrk's pension claim is denied.

> vi.    Hostile Work Environment

Defendants also move to dismiss any hostile work environment claim under USERRA. *See* ECF No. 22-6 at 25–26. As Judge Furman recently commented, "[i]t is unclear whether a USERRA hostile work environment claim is even a thing." *See Hansen*, 2025 WL 588119, at *8 (collecting authority expressing uncertainty on the issue). But the Court need not resolve that question today because the Complaint contains no claim for hostile work environment with

respect to Bjelobrk.  *Cf.* Compl. ¶¶ 90–92 (explicit allegations of hostile work environment with respect to Veronko).  And the Opposition does not even mention hostile work environment. Because Bjelobrk advances no hostile work environment claim, there is nothing to dismiss.

### **CONCLUSION**

For the reasons explained herein, Defendants' motion to dismiss is GRANTED in its entirety with respect to Veronko.  The Clerk of Court is respectfully directed to terminate Veronko from this action.  The motion to dismiss is also GRANTED with respect to Plaintiff Bjelobrk's claims accruing before Bjelobrk's assignment to the Seventh Precinct in 2004 as well as his claims based on his allegations concerning his vacation days.  Otherwise, the motion to dismiss is DENIED.  Finally, the motion to dismiss is GRANTED with respect to Defendants Suffolk County Police Department and Suffolk County Department of Human Resources, Personnel and Civil Service.  The Clerk of Court is also directed to terminate them from this action.  Suffolk County must answer the non-dismissed portions of the Complaint on or before March 19, 2025, and, in light of this decision, the Court *sua sponte* extends the deadline to complete discovery to May 15, 2025.

SO ORDERED.

                                   */s/ Hector Gonzalez*
                                    HECTOR GONZALEZ
                                    United States District Judge

Dated: Brooklyn, New York
       March 5, 2025